Charles E. CALLENDER, Appellant,

v.

Rebecca D. SKILES and Rick
L. Skiles, Appellees.

No. 98–308.

Supreme Court of Iowa.

Feb. 17, 1999.

As Amended on Denial of Rehearing
April 12, 1999.

Dennis D. Jasper, Bettendorf, for appellant.

R. Douglas Wells and Jim Stein of Wells & Wells, Davenport, for appellee Rebecca D. Skiles.

Cynthia Z. Taylor of Zamora, Taylor & Walters, Davenport, for appellee Rick L. Skiles.

Jill A. Cirivello, Davenport, guardian ad litem for minor child.

CADY, Justice.

This anomalous and emotionally charged action was brought against a married couple by a man claiming to be the biological father of a child born to their marriage. He sought to judicially establish paternity, and requested a determination of custody, support, and visitation. The district court eventually dismissed his claim. We reverse and remand for further proceedings.

Rebecca and Rick Skiles are married. In 1994, they separated for a period of time. During this time, Rebecca began a relationship with a co-worker, Charles Callender. The relationship became intimate, and included sexual intercourse.

Rebecca and Charles eventually ended their relationship. Rebecca and Rick subsequently reconciled, and resumed living together in their marital home.

On June 25, 1995, Rebecca gave birth to a child conceived during the marital separation. Rebecca and Rick named the child Samantha and continued to raise their family in their marital home. Emotional upheaval, however, was not far away.

Six months after Samantha's birth, Charles filed an application with the district court to establish paternity of Samantha, as well as custody, visitation, and child support. He also requested blood testing to determine paternity. The district court ordered the blood tests. The results revealed a 99.98% probability Charles was the biological father of Samantha.

Charles promptly filed an application for visitation following the results of the blood tests. On April 19, 1996, the district court granted limited visitation at a neutral location.

Charles later amended his application to add Rick as a party. He also requested Rick's parental rights to Samantha be terminated. Additional blood tests excluded Rick as the biological father. Rick, however, did not deny paternity in his answer and has not abandoned his parental responsibilities.

Rick eventually moved to dismiss the application, claiming Charles had no standing to commence a paternity action. The district court determined Charles had no standing to bring a paternity claim and dismissed the application. This appeal followed.

Charles claims he is entitled to litigate his claim as an "interested person" under Iowa Code section 600B.8 (1997), or the "established father" under Iowa Code section 600B.41A(3). If not, he asserts the statute deprives him of due process and equal protection under the federal and state constitutions.

I. **Standard of Review.**

◼◼◼ Our review of paternity actions under chapter 600B is for errors at law. *Mason v. Hall,* 419 N.W.2d 367, 369 (Iowa 1988). Likewise, our review of statutory interpretation is at law. *State ex rel. Schuder v. Schuder,* 578 N.W.2d 685, 687 (Iowa 1998).

Our review of constitutional claims is de novo. *Norland v. Grinnell Mut. Reins. Co.*, 578 N.W.2d 239, 241 (Iowa 1998).

## II. Statutory Background.

█ Paternity may be determined at law or equity in Iowa. *See In re Marriage of Stogdill*, 428 N.W.2d 667, 670 (Iowa 1988). Our statutes permit the issue to be determined in equity under Iowa Code chapter 252A or chapter 598. *Id.* It may be determined at law under chapter 600B. *Id.* At common law, an action to determine paternity was not recognized. *State ex rel. Bishop v. Travis*, 306 N.W.2d 733, 734 (Iowa 1981); 14 C.J.S. *Children Out of Wedlock* § 70, at 358 (1991) (right to determine paternity did not exist at common law, but is entirely statutory).

The parties acknowledge chapter 598 and chapter 252A are not applicable to this case. Chapter 598 applies to proceedings in the dissolution of a marriage. *See* Iowa Code § 598.31. Chapter 252A applies to actions brought by the dependent person for whom the support is sought or by some public representative of the person. *See id.* § 252A.6; *see also id.* § 252A.2(9). Thus, our task is to determine whether Charles has a cause of action under chapter 600B.

Chapter 600B generally exists to judicially enforce the recognized obligation of parents to support a child born out of wedlock and not legitimized. *Id.* § 600B.1. Such proceedings may be initiated "by the mother, or other interested person," or the state authorities "if the child is or is likely to be a public charge." *Id.* § 600B.8. In the event of the death or disability of the mother, the action may be brought by the child acting through a guardian. *Id.* The action not only exists to establish paternity and support, but may also lead to a separate equitable proceeding to establish visitation and custody if a judgment of paternity is established. *Id.* § 600B.40.

To assist in the proceedings, blood tests are available which can result in a rebuttable presumption of paternity. *Id.* § 600B.41(5). This presumption can only be overcome by clear and convincing evidence. *Id.* Additionally, our legislature has recently amended chapter 600B to provide for the filing of a petition, not to establish paternity, but to overcome paternity which has previously been established. *Id.* § 600B.41A. It applies where paternity has been legally established under section 252A.3(8) (by court order, statement of the parents, or by the filing of an affidavit of paternity), by operation of law based on marriage, or as otherwise determined by a court. *Id.* § 600B.41A(1). However, the petition to overcome paternity can only be filed by "the mother of the child, the established father of the child, the child, or the legal representative" of the parties. *Id.* § 600B.41A(3)(a)(1). We must determine if the statute permits Charles to file a petition as an "interested person" under section 600B.8 or an "established father of the child" under section 600B.41A.

### A. Established Father.

█ Although the term "established father" is not expressly defined by our legislature, companion statutes make it clear it refers to paternity which has been established by some means authorized by law. *See id.* § 600B.41A(1); *Dye v. Geiger*, 554 N.W.2d 538, 539 (Iowa 1996). The law deems Rick to be Samantha's father by virtue of his marriage to Rebecca.[1] We acknowledge blood tests can lead to the establishment of paternity, but they do not establish paternity without a court order. *See id.* § 600B.41. Thus, Charles does not become the established father by virtue of the blood tests that have been taken in this case. Rick, not Charles, is the established father of Samantha. Charles is not authorized under section 600B.41A(3) to commence an action to overcome paternity.

---

1. Iowa Code section 252A.3(4) provides:
 A child or children born to parents who, at any time prior or subsequent to the birth of such child, have entered into a civil or religious marriage ceremony, shall be deemed the legitimate child or children of both parents, regardless of the validity of such marriage.

Iowa Code section 144.13 states in pertinent part:
If the mother was married either at the time of conception or birth, the name of the husband shall be entered on the certificate as the father of the child. . . .

### B. Interested Person.

Like "established father," the term "interested person" under section 600B.8 is not specifically defined by statute. Charles asserts, however, we have previously used the term to broadly include claims by persons outside a marriage who have developed a close relationship with a child. *See In re Ash,* 507 N.W.2d 400, 404 (Iowa 1993).

In *Ash,* we rejected a paternity claim by a man who was not the biological father of a child, but had lived with and cared for the child for several years. *Id.* In rejecting the equitable parenting doctrine under the circumstances presented, we referred to the claimant as "an interested third party." *Id.* However, this reference was not made in the context of interpreting section 600B.8, but was merely an attempt to generally identify the claimant's legal relationship with the child. *Id.*

It is clear our legislature intended chapter 600B as a means to force parents to comply with their obligation to support their children. Iowa Code § 600B.1. The adjudication of paternity is simply an essential prerequisite to the enforcement of that obligation, not an independent proceeding for a putative father to pursue other goals. The chapter does not contemplate that a putative father be included within the persons entitled to bring an action to establish paternity. Instead, it specifically declares the person sought to be declared the father be named in the action as a defendant. *Id.* § 600B.14. Furthermore, we must give recognition to our legislative distinction between an action to *establish paternity* and actions to *overcome paternity. See Treimer v. Lett,* 587 N.W.2d 622 (Iowa App.1998). In this case, paternity had been established by operation of law prior to the time Charles filed his action. Therefore, there is no paternity to establish, and we have previously determined our legislature has not given Charles a right to *overcome paternity.* Charles is not an "interested person" under section 600B.8.

### C. General Equitable Right.

Lastly, Charles argues section 600B.7 gives him a general equitable right to bring his action. This section provides that a proceeding to establish paternity under chapter 600B is not "exclusive of other proceedings that may be available on principles of law or equity." Iowa Code § 600B.7. This section, however, does not help Charles.

Section 600B.7 does not create a separate action for paternity but merely provides that proceedings to establish paternity under the chapter are not exclusive of any other available proceedings. We have combed our statutes and find no other legislative right of action for Charles. Furthermore, we do not recognize any separate equitable parenting principles which would give a person outside a marriage the right to establish paternity. *See In re Ash,* 507 N.W.2d at 403–05; *In re Marriage of Gallagher,* 539 N.W.2d 479 (Iowa 1995). Finally, equity does not establish the right to institute a particular action, but merely comes into play when such a right exists and the legal principles do not provide the needed relief.

### III. Statutory Right.

We have carefully considered our legislation governing paternity. Our statutes expressly enumerate those persons who may petition the court to establish or overcome paternity, and fail to include those who claim to be the biological father of a child born into a marriage. We have repeatedly recognized the express mention of one thing in a statute implies the exclusion of another. *Lacina v. Maxwell,* 501 N.W.2d 531, 533 (Iowa 1993). Clearly, legislative intent is expressed by omission as well as inclusion. *State ex rel. Miller v. Santa Rosa Sales & Mktg., Inc.,* 475 N.W.2d 210, 218 (Iowa 1991). We are convinced our legislature did not intend for its laws of paternity and support to be used by a putative father to challenge the established or presumed paternity of children born into a marriage. Accordingly, we conclude our legislature has not provided Charles with standing to assert his claim.

### IV. Constitutional Claims.

Having determined our statute denies Charles standing to seek relief, we must next consider the constitutional issues raised by Charles. He claims his exclusion from the

statute violates the Due Process and Equal Protection Clauses of our federal and state constitutions.

The Due Process Clause of the United States Constitution prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Iowa Constitution contains similar language stating "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9.

In many instances we have deemed the federal and state due process and equal protection clauses to be identical in scope, import, and purpose. *In re C.P.*, 569 N.W.2d 810, 811 (Iowa 1997). However, it is the exclusive prerogative of our court to determine the constitutionality of Iowa statutes challenged under our own constitution. *Putensen v. Hawkeye Bank*, 564 N.W.2d 404, 408 (Iowa 1997) (holding nonjudicial foreclosure did not involve sufficient state action to trigger Iowa Constitution's due process clause). Although we may look upon the United States Supreme Court's interpretations of the Due Process Clause in the federal constitution for guidance, we are not bound by these interpretations. *Id.; State ex rel. Kuble v. Bisignano*, 238 Iowa 1060, 1066, 28 N.W.2d 504, 508 (1947) (although language contained in the Iowa Constitution concerning the Fourth Amendment is identical to the federal constitution, the Supreme Court of Iowa does not need to follow construction placed on the language by the United States Supreme Court). Our freedom to interpret our constitution is of course in contrast to determinations in federal constitutional challenges, where we are obliged to conform with the interpretations of the United States Supreme Court. *State v. James*, 393 N.W.2d 465, 466 (Iowa 1986). Additionally, we traditionally exercise great caution in declaring legislation unconstitutional. *State v. Rivera*, 260 Iowa 320, 322–23, 149 N.W.2d 127, 129 (1967); *Stoner McCray Sys. v. City of Des Moines*, 247 Iowa 1313, 1323, 78 N.W.2d 843, 847 (1956) (holding city ordinance, requiring immediate removal of existing billboards or special council permission to keep billboards in use, which did not provide for compensation for billboards violated due process provisions of state and federal constitutions).

Our review of authorities outside Iowa reveals other jurisdictions have followed several approaches to resolve attempts by putative fathers to establish or overcome paternity of a child conceived or born during wedlock. *See* 41 Am.Jur.2d *Illegitimate Children* § 17 (1995). The resolution of this issue frequently turns on whether the statutory scheme in place allows the putative father standing to assert paternity. *See* Donald M. Zupanec, Annotation, *Who May Dispute Presumption of Legitimacy of Child Conceived or Born During Wedlock*, 90 A.L.R.3d 1032 (1979).

Where a statute creates a presumption that a child born to a married woman living with her husband is a child of the marriage, and only the husband or wife may rebut this presumption, the United States Supreme Court determined in a plurality decision the statute did not violate the putative father's substantive or procedural due process rights. *See Michael H. v. Gerald D.*, 491 U.S. 110, 129, 109 S.Ct. 2333, 2345, 105 L.Ed.2d 91, 109 (1989).[2] The court also determined the statute did not violate the child's due process rights to maintain a relationship with her putative father and did not violate her equal

2. The *Michael H.* decision followed a line of four cases dealing with putative fathers' rights. The Court initially determined a statute permitting the presumption all putative fathers were unfit parents was unconstitutional. *Stanley v. Illinois*, 405 U.S. 645, 658, 92 S.Ct. 1208, 1216, 31 L.Ed.2d 551, 562–63 (1972). The court then held a putative father could not veto the adoption of an illegitimate child where he had not petitioned for legitimation or taken an active role in the child's life during the eleven-year period between birth and the adoption petition. *Quilloin v. Walcott*, 434 U.S. 246, 256, 98 S.Ct. 549, 555, 54 L.Ed.2d 511, 520 (1978). The Court also determined the Equal Protection Clause does not permit a state to deny a father who admits paternity and takes an active role in the child's life veto power over adoptions while granting the mother veto power. *Caban v. Mohammed*, 441 U.S. 380, 394, 99 S.Ct. 1760, 1769, 60 L.Ed.2d 297, 308 (1979). Finally, the Court held a putative father who had never established a substantial relationship with his child was not entitled to notice prior to an adoption proceeding. *Lehr v. Robertson*, 463 U.S. 248, 267–68, 103 S.Ct. 2985, 2996–97, 77 L.Ed.2d 614, 630–31 (1983).

protection rights. *Id.* at 131, 109 S.Ct. at 2346, 105 L.Ed.2d at 111.[3]

There is currently a great deal of controversy over the *Michael H.* decision. *See* David Line Batty, Note, *Michael H. v. Gerald D.: The Constitutional Rights of Putative Fathers and a Proposal for Reform,* 31 B.C. L.Rev. 1173 (1990). Some jurisdictions follow the line of reasoning established in *Michael H.* and hold statutes which deny a putative father standing constitutional under the state or federal constitutions. *See, e.g., Dawn D. v. Superior Ct.,* 17 Cal.4th 932, 72 Cal.Rptr.2d 871, 952 P.2d 1139, 1146 (1998) (finding alleged biological father seeking to establish relationship with child born to married mother did not have constitutionally protected liberty interest in forming relationship with child under California Constitution); *Hauser v. Reilly,* 212 Mich.App. 184, 536 N.W.2d 865, 868 (1995) (agreeing with Justice Brennan's dissent in *Michael H.*; in the absence of a parent-child relationship between putative father and child, statute depriving putative father of standing to challenge paternity did not violate due process); *Markert v. Behm,* 394 N.W.2d 239, 243–44 (Minn.Ct.App.1986) (statute denying putative fathers standing to bring paternity action does not violate due process or equal protection rights under the United States Constitution); *Merkel v. Doe,* 63 Ohio Misc.2d 490, 635 N.E.2d 70, 72 (Ohio Ct.Com.Pl.1993) (finding paternity statute which granted putative fathers standing to assert paternity to a child born during a marriage was unconstitutional due process infringement on fundamental interest of child's family and statute was not sufficiently narrowly tailored for due process purposes); *Amrhein v. Cozad,* 714 A.2d 409, 411 (Pa.Super.Ct.1998) (holding

presumption of paternity that applies to intact family prevented an order by the court for a blood test or the use of privately obtained blood test to rebut the presumption of legitimacy); *Evans v. Steelman,* 970 S.W.2d 431, 434–35 (Tenn.1998) (holding statute denying putative father standing to bring legitimation action under statute in effect at the time did not violate due process or equal protection of state or federal constitutions); *A v. X,Y, & Z,* 641 P.2d 1222, 1224–27 (Wyo. 1982) (holding statute that conferred putative father no standing to challenge paternity of a child born in wedlock did not deny due process or equal protection).

On the other hand, it has been recognized that a statutory scheme depriving a putative father of standing to rebut the marital presumption or establish paternity violates portions of the state constitution. *See R. McG. v. J.W.,* 200 Colo. 345, 615 P.2d 666, 672 (1980) (equal protection provision of Colorado Constitution mandated putative father be given standing to establish paternity while mother is married); *In re J.W.T.,* 872 S.W.2d 189, 198 (Tex.1994) (statute denying putative father standing to challenge paternity violated due process clause of state constitution), *superseded by statute in* Tex. Fam.Code Ann. § 160.101(a)(3) (West 1996) (permits biological father to contest another man's status as presumed father); *see also* Chester A. Caldwell, Note, *Texas Expands Biological Fathers' Rights to Rebut the Marital Presumption and Establish Parental Rights to Children with Presumed Fathers: In the Interest of J.W.T.,* 25 Tex. Tech. L.Rev. 193 (1993). Further, there is a trend toward interpreting paternity statutes to allow a putative father standing at some level.[4] *See*

---

**3.** *Michael H.* and *Lehr v. Robertson* suggest there are three main approaches for determining whether a putative father has a protected liberty interest in a relationship with his child. *See Hauser v. Reilly,* 212 Mich.App. 184, 536 N.W.2d 865, 867–68 (1995). Writing for the majority in *Michael H.,* Justice Scalia denied the putative father standing because his claim for maintaining a relationship with his child when the child's mother gave birth to the child while married was not so deeply embedded in our cultural traditions to establish a fundamental right. *Michael H.,* 491 U.S. at 125–27, 109 S.Ct. at 2343, 105 L.Ed.2d at 107–08. Justice Brennan's dissent, conversely, determined the putative father had a

liberty interest when the biological interest was combined with a substantial parent-child relationship. *Id.* at 142–43, 109 S.Ct. at 2352, 105 L.Ed.2d at 118. In *Lehr,* Justice White dissented, stating the father's biological link with the child forms the putative father's liberty interest and the development of the relationship is relevant to its weight rather than its nature. *Lehr,* 463 U.S. at 272, 103 S.Ct. at 2999, 77 L.Ed.2d at 633.

**4.** While Texas determined a statute denying the putative father standing to challenge paternity was unconstitutional under its constitution, numerous states permit a putative father standing

*Dawn D.*, 72 Cal.Rptr.2d 871, 952 P.2d at 1157 n. 4 (Chin, J., dissenting) (pointing out at least twenty states grant the putative father some form of a hearing before being excluded from his child's life in situations where a mother is married to a man other than the putative father at the time of conception or birth of the child).

Charles claims if Iowa Code section 600B.41A is interpreted to deny him standing in his paternity action, it violates the procedural due process, substantive due process, and equal protection clauses of the Iowa Constitution. He maintains the Iowa Constitution grants greater protection than that provided by the federal constitution. In support of this contention he asserts his case is similar to *In re J.W.T.*, 872 S.W.2d 189 (Tex. 1994). He further points out it is in Samantha's best interest to know her biological father and the policy of promoting family stability cannot outweigh his right to challenge paternity in this situation. We believe the proper analysis first requires consideration of Charles' procedural due process rights under the Iowa Constitution. *See Michael H.*, 491 U.S. at 148, 109 S.Ct. at 2355, 105 L.Ed.2d at 122 (Brennan, J., dissenting).

 Due process must be afforded when an individual is threatened by state action which will deprive the individual of a protected liberty or property interest. *State ex rel. Hamilton v. Snodgrass*, 325 N.W.2d 740, 745 (Iowa 1982). We must therefore first determine whether a protected liberty interest is involved. *See Michael H.*, 491 U.S. at 145, 109 S.Ct. at 2354, 105 L.Ed.2d at 120 (Brennan, J., dissenting). If a protected liberty interest is involved, we must then evaluate what process is due. *See Boddie v. Connecticut*, 401 U.S. 371, 377, 91 S.Ct. 780, 785, 28 L.Ed.2d 113, 118 (1971) ("[D]ue process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard."); *Citizens State Bank v. Harden*, 439 N.W.2d 677, 681 (Iowa App. 1989). The requirements of due process are flexible and accordingly the type of hearing required depends upon "(a) the private interests implicated; (b) the risk of an erroneous determination by reason of the process accorded and the probable value of added procedural safeguards; and (c) the public interest and administrative burdens, including costs that the additional procedures would involve." *In re Marriage of Seyler*, 559 N.W.2d 7, 9 (Iowa 1997) (quoting *United*

under several theories. For instance, several states have interpreted statutes with conflicting presumptions (presumption husband is the child's father, and the presumption a certain blood test result presumes fatherhood) to mean the presumption favoring the married father can be rebutted by the putative father. *See, e.g., In re B.J.H.*, 573 N.W.2d 99, 103–04 (Minn.Ct.App. 1998); *In re Richard W.*, 212 A.D.2d 89, 629 N.Y.S.2d 512, 513–14 (1995); *see also* Hon. Linda L. Chezem & Sarah L. Nagy, *Judicial Abrogation of a Husband's Paternity: Can a Third Party Seek to Establish Paternity Over a Child Born into a Marriage While that Marriage Remains Intact?*, 30 Ind. L.Rev. 467 (1997). Other states interpret the statutory language to grant the putative father standing to challenge paternity. *See, e.g., R.A.J. v. L.B.V.*, 169 Ariz. 92, 817 P.2d 37, 40 (Ct.App.1991) (interpreting "father" in statute listing individuals permitted to commence a paternity·action to include "putative father"); *Willmon v. Hunter*, 297 Ark. 358, 761 S.W.2d 924, 926 (1988) (statutory legitimacy presumptions do not preclude a party from litigating paternity); *see also Simcox v. Simcox*, 131 Ill.2d 491, 137 Ill.Dec. 664, 546 N.E.2d 609, 612 (1989) (although putative father had statutory right to bring paternity action, issue of whether he was

barred from such action was not ripe); *K.S. v. R.S.*, 669 N.E.2d 399, 404 (Ind.1996) (statute permits putative father to maintain paternity action); *Smith v. Jones*, 566 So.2d 408, 413–14 (La.Ct.App.1990) (recognizing dual paternity, where biological father has actual relationship with child or has been prevented from forming relationship by mother, and acts to establish paternity within a reasonable time of child's birth, he may use compulsory blood test in avowal action); *Ivy v. Harrington*, 644 So.2d 1218, 1223 (Miss.1994) (putative father has standing to challenge paternity to child born during mother's marriage to another man); *M.F. v. N.H.*, 252 N.J.Super. 420, 599 A.2d 1297, 1299–1301 (App. Div.1991) (putative father had standing to bring paternity action, but action could not proceed unless in the best interests of the child); *McDaniels v. Carlson*, 108 Wash.2d 299, 738 P.2d 254, 260–62 (1987) (while paternity statute permits putative father standing to contest paternity, action will not go forward unless it is in the best interests of the child); *In re T.R.B.*, 154 Wis.2d 637, 454 N.W.2d 561, 561–62 (Ct.App.1990) (hearing to determine child's best interests necessary before putative father's action to establish paternity could be heard).

States v. Raddatz, 447 U.S. 667, 677, 100 S.Ct. 2406, 2413, 65 L.Ed.2d 424, 434 (1980)).

We have repeatedly found fundamental interests in family and parenting circumstances. With regard to family issues we have recognized:

"[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." The right of a parent to companionship, care, custody, and management of his or her children has been recognized as "far more precious ... than property rights ...," and more significant and priceless than "liberties which derive merely from shifting economic arrangements." "It is not disputed that state intervention to terminate the relationship between [a parent] and [the] child must be accomplished by procedures meeting the requisites of the Due Process Clause." A parent's interest in maintaining family integrity is best protected by the Due Process Clause. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."

In re A.M.H., 516 N.W.2d 867, 870 (Iowa 1994) (citations omitted) (consequences of CINA proceeding are not to be equated with those of parental termination for purposes of determining the process due).

More particularly, we have recognized the significance of the biological link between parent and child in the context of adoption. See In re B.G.C., 496 N.W.2d 239, 245 (Iowa 1992) (finding parental rights could not be terminated solely on consideration of child's best interest, and adoption proceedings were fatally flawed insofar as natural father's paternal rights had not been terminated). Additionally, we have recognized the importance of the biological connection between a child and its grandparents by allowing grandparent visitation in certain circumstances. See McMain v. Iowa Dist. Ct., 559 N.W.2d 12, 15 (Iowa 1997). Although we also recognize the rights of biological parents are not absolute, and may be lost, we have required notice and a hearing before termination may occur. See

In re B.G.C., 496 N.W.2d at 245. Thus, we have a strong history of providing due process protection to parents.

 We acknowledge our society has not traditionally afforded parental rights to persons like Charles. See Michael H., 491 U.S. at 124, 109 S.Ct. at 2342, 105 L.Ed.2d at 106. This is an important consideration in determining the existence of a fundamental interest. Id. Due process protections, however, should not ultimately hinge upon whether the right sought to be recognized has been historically afforded. Our constitution is not merely tied to tradition, but recognizes the changing nature of society. See Redmond v. Carter, 247 N.W.2d 268, 273 (Iowa 1976) (constitution is not fixed). The traditional ways to establish legal parentage have dramatically changed in recent generations, as has the traditional makeup of the family. Scientific advancements have opened a host of complex family-related legal issues which have changed the legal definition of a parent. It has also made the identity of a biological parent a virtual certainty. Social stigmas have also weakened. If we recognize parenting rights to be fundamental under one set of circumstances, those rights should not necessarily disappear simply because they arise in another set of circumstances involving consenting adults that have not traditionally been embraced. Instead, we need to focus on the underlying right at stake. The nontraditional circumstances in which parental rights arise do not diminish the traditional parental rights at stake. We therefore find Charles has a liberty interest in challenging paternity.[5]

 In evaluating what process is due, we look to the nature of the liberty interest involved. We recognize the rights of the child, the parents, and the state are implicated. See McDaniels v. Carlson, 108 Wash.2d 299, 738 P.2d 254, 261 (1987) (discussing policy concerns under the Uniform Parentage Act). We must therefore balance the state's interest in protecting the child and preserving the marital family versus the putative father's interest in receiving an op-

5. In finding Charles has a liberty interest in challenging paternity, we recognize he may have a fundamental right to maintain a relationship with Samantha. Whether he would ultimately have this right and under what circumstances he would have this right is not yet before us.

portunity to establish a relationship with his child. *See J.W.T.*, 872 S.W.2d at 195.

The state's interests involve preserving the integrity of the family, the best interests of the child, and administrative convenience. There may also be interests of other children in the family at stake. While some courts find the notion constitutional that the putative father should not be permitted to disrupt the integrity of the family under *any* circumstances, we find this view narrow under our constitution and inconsistent with our case law dealing with parental rights. We have already recognized the significance of the parent-child relationship in the context of due process. *See In re A.M.H.*, 516 N.W.2d at 870. It is also significant that by granting putative fathers standing to challenge paternity despite the mother's marital status, we recognize the truth and discourage deceit. *See In re Richard W.*, 212 A.D.2d 89, 629 N.Y.S.2d 512, 514 (1995) (recognizing if truth about paternity can be discovered, and equity does not demand otherwise, presumption of legitimacy should not be used to perpetuate a falsehood). Further, the decline of the stigma of illegitimacy and the reliability of DNA testing weigh in favor of the putative father's right of standing. *See Amrhein*, 714 A.2d at 415–16 (Popovich, J., dissenting). Moreover, any interest in preserving the family cannot outweigh the putative father's interest in standing because the integrity of the family suffered at the time of the extramarital affair. *See Hauser*, 536 N.W.2d at 871 (Kavanagh, J., dissenting). Further, denying a putative father standing to challenge paternity conflicts with our societal goal of encouraging fathers to take responsibility for their children. *See Dawn D.*, 72 Cal.Rptr.2d 871, 952 P.2d at 1158 (Chin, J., dissenting) ("... a biological connection that is sufficient to establish a natural father's potential financial responsibility for his child should also give rise to a constitutional interest in the opportunity to develop a relationship with that child ..."). Finally, we note it is common for a child to live with a stepfather and still maintain a relationship with the biological father.

In *Michael H.* Justice Brennan recognized:

We are not an assimilative, homogenous society, but a facilitative pluralistic one, in which we must be willing to abide someone else's unfamiliar or even repellant practice because the same tolerant impulse protects our own idiosyncracies. Even if we agree, therefore, that "family" and "parenthood" are part of the good life, it is absurd to assume that we can agree on the content of those terms and destructive to pretend that we do. In a community such as ours, "liberty" must include the freedom not to conform. The plurality today squashes this freedom by requiring specific approval from history before protecting anything in the name of liberty.

*Michael H.*, 491 U.S. at 141, 109 S.Ct. at 2351, 105 L.Ed.2d at 117 (Brennan, J., dissenting). The ideas espoused by Justice Brennan are consistent with our observation in *In re B.G.C.* that we do not believe courts should engage in "uncontrolled social engineering" and courts should not take children from parents simply because another home has more advantages. *See In re B.G.C.*, 496 N.W.2d at 241. This approach also prevents the mother from exclusively determining the child's best interests, defining the family, and defining the scope of the putative father's rights. *See In re J.W.T.*, 872 S.W.2d at 197.

In balancing the important considerations at issue in this case, we acknowledge the policy of promoting the sanctity and stability of the family. This is clearly an important value in our society, which engenders a desire to protect the family in this case, and the child, from challenges to something as basic as paternity. Yet, this policy as applied in this case is far from absolute and, in truth, is used only to exclude the putative father from challenging paternity. The mother, the established father, and even the child, are permitted to file a petition to challenge paternity. Thus, while the overall policy of promoting stability of the family remains strong, the ability of family members to challenge paternity, and disrupt the family unit, reveals the interests of the state in depriving the same procedures to a putative father outside the family are diminished. In balancing the multitude of compelling interests which permeate this case, we conclude

the due process rights of the putative father must prevail.

▮▮▮▮▮ We therefore hold Iowa Code section 600B.41A unconstitutional under our state constitution to the extent it denies Charles standing to overcome paternity. *See Pierce v. Incorporated Town of La Porte City*, 259 Iowa 1120, 1125, 146 N.W.2d 907, 910 (1966) ("Power to violate the due process clauses is lacking in the legislative body no matter how it attempts to exercise it."). Despite the presence of an existing family, the rights of a putative father cannot be denied without an opportunity for a hearing. That right, however, like other constitutional rights, can be waived. *Messina v. Iowa Dep't of Job Serv.*, 341 N.W.2d 52, 60 (Iowa 1983). Thus, although we recognize a right for Charles to petition the court to challenge paternity in this case, we also recognize this right can be lost by waiver, which may be the threshold question to consider before addressing paternity. If the challenge is not a serious and timely expression of a meaningful desire to establish parenting responsibility, it may be lost. *See In re J.W.T.*, 872 S.W.2d at 195 (father must acknowledge responsibility for child support or other care and maintenance, and makes serious and continuous efforts to establish a relationship with the child). Moreover, we are not saying our constitution guarantees every putative father a relationship with a child born into a marriage. While we allow a biological father standing to challenge paternity, this is not determinative of the ultimate issue of whether the father will have a relationship with his child. Procedural due process does not prohibit the state from later making a substantive choice that infringes on a liberty interest. We only hold our statute must provide a procedural mechanism for claims to be brought. We leave the substantive claim of parenting for further determination under the similar standards governing the challenge of an established father, including the best interest of the child. *See* Iowa Code § 600B.41A(6), as amended by 1997 Iowa Acts ch. 175, § 215.

Accordingly, we remand this case to the district court for further determination of the standing afforded Charles under the test we have outlined. Because we have granted relief on this issue, we need not consider Charles' additional claims.

## V. Conclusion.

We find a putative father of a child born into a marriage may have a right to standing to challenge paternity under the Due Process Clause of the Iowa Constitution. This right can be waived, and we leave it to the district court to determine whether the principles of waiver preclude a challenge in each particular case. We recognize time to be a critical element of this inquiry, as well as the efforts to establish a relationship.

We remand this case to the trial court to make a factual inquiry to determine whether Charles may pursue his claim in this case. To the extent Iowa Code section 600B.41A(3)(a)(1) denies Charles standing, we find this section unconstitutional under the Iowa Constitution.

**REVERSED AND REMANDED.**

All justices concur except HARRIS, J., McGIVERIN, C.J., and LARSON and NEUMAN, JJ., who dissent.

HARRIS, Justice (dissenting).

I respectfully dissent. The majority recognizes, as it must, that Charles has no statutory right to intrude into the Skiles' family structure, or to challenge the parental status established under Iowa Code section 252A.3(4) (child born to married person "shall be deemed the legitimate child ... of both parents"), or in Code section 144.13(2) (husband's name shall be entered on birth certificate as father). The majority then obviates the obvious result of its correct statutory interpretation by subscribing to the dissent in *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). I strongly agree with the plurality holding in *Michael H.* and with those courts, cited by the majority, that subscribe to it.

In positing its recognition of Charles' liberty interest to challenge paternity, the majority relies on our holding in *In re B.G.C.*, 496 N.W.2d 239 (Iowa 1992). *B.G.C.* does not require us to yield to the liberty interest

claimed here. The biological father in *B.G.C.* was not assailing an existing family. Some may contend a "liberty interest" should arise to one who conceives a child by a married woman who was—and remains—married. It should not arise, at least it should not prevail, here. For good and sufficient reasons, society has traditionally considered a child born to a married couple to be the legitimate child of both. This view is reflected in Iowa Code section 252A.3(4).

Family relationships do not rest exclusively on shared genes. A child puts down its family roots on the basis of environment, and the resulting ties deserve the law's protection. This remains true even in an age that has known assaults on nearly all of society's institutions, including the family. It strikes me as unwise to set up a court process in order to undo a recognized family structure. Even the biological father, who is after all an outsider to the family, should not be allowed to invade it.

The majority is misled into its holding because it already knows of the biological relationship. The process authorized by the majority, in claims to be sorted out in future cases, will include many false ones where a husband-and-wife relationship will be outrageously disturbed in defending against such a suit.

A biological claim should not alone justify unwrapping a parent-child relationship established within a family. A predatory rapist could make the same biological claim this plaintiff does, a point made in *Michael H.* *See Michael H.,* 491 U.S. at 124–25 n. 4, 109 S.Ct. at 2342 n. 4, 105 L.Ed.2d at 106–07 n. 4.

I would affirm.

McGIVERIN, C.J., and LARSON and NEUMAN, JJ., join this dissent.